# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

THE WINDWARD ON LAKE CONWAY
CONDOMINIUM ASSOCIATION, INC.,

    Plaintiff,

vs.                                        CASE NO.: 6:14-cv-00607-RBD-KRS

UNITED NATIONAL INSURANCE
COMPANY and APPALACHIAN
UNDERWRITERS, INC.,

    Defendants.
_____/

### DEFENDANT UNITED NATIONAL INSURANCE COMPANY'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant/Crossclaim Defendant, UNITED NATIONAL INSURANCE COMPANY ("UNITED NATIONAL"), by and through its undersigned counsel, and hereby submits its Reply Memorandum in Support of its Dispositive Motion for Summary Judgment [D.E. 43]:

WINDWARD's Response [D.E. 46] begins with an alleged narrative which both mischaracterizes the nature of this action as well as sets forth allegations superfluous to this Court's analysis. While UNITED NATIONAL continues to deny any allegations of impropriety in its claims handling, any and all such allegations are immaterial to the issue presently before the Court: whether the subject UNITED NATIONAL policy ("Policy") [D.E. 42-19] provides coverage for WINDWARD's damages. The Policy does not provide coverage for WINDWARD's damages, as it does not provide any coverage beyond the vacant building coverage set forth therein. WINDWARD cannot rewrite the Policy or the history of its procurement in order to correct the failures of its agent(s) in procuring the coverage it may have wanted. In this Reply, UNITED

1

NATIONAL will address the arguments set forth in WINWARD's Response in the order that they appear therein.

I. **The Policy as Written Does Not Provide Coverage for WINDWARD's damages.**

WINDWARD acknowledges that unambiguous Policy terms should be given their plain meaning and enforced as written. [D.E. 46 at 4]. WINDWARD instead argues that UNITED NATIONAL's interpretation of the Policy is flawed, and that this Court should instead adopt WINDWARD's interpretation. The key difference is that UNITED NATIONAL's "interpretation" is simply the application of the plain meaning of Policy terms as written, whereas WINDWARD's "interpretation" is the wholesale reconstruction and reimagining of the Policy to provide meaning that is not present in the plain text. UNITED NATIONAL asks the Court to enforce the text of the Policy while WINDWARD asks the Court to selectively add and omit Policy language to arrive at WINDWARD's desired result. The unreasonableness of WINDWARD's "interpretation" is amply illustrated in the text of its Response, quoted here in verbatim:

> "The vacancy endorsement states that, "[w]e will not pay for loss or damage at any designated premises that is not vacant when the loss or damage occurs." [DE 44-2, p. 95]. Windward, however, is not claiming damage to property that is owned or occupied by someone else, specifically individual unit owners."

[Id.].

WINDWARD quotes the subject vacancy exclusion, and then immediately ignores the text by referencing issues that have nothing to do with the plain language. The exclusion is straightforward: the Policy does not apply to premises that are not vacant. WINDWARD's immediate response to the same is to discuss the identity of who owns or occupies specific units and/or specific areas in the building. The exclusion makes no mention of condominium units, the identity of the owner/occupier, or what particular portion of the building is occupied. It simply says that only vacant buildings are covered.

2

The entire basis of WINDWARD's argument in this case is the avoidance of the plain language of the vacancy exclusion. As previously discussed, WINDWARD's "interpretation" of the vacancy exclusion is to ignore it entirely and wish it away. That is not an "interpretation" of the Policy's language, and is certainly not a reasonable interpretation giving rise to ambiguity. Because the property was inarguably occupied at the time of loss, WINDWARD scrambles to find reasons to avoid or alter the vacancy exclusion. One recurring argument is that the enforcement of the vacancy exclusion would somehow result in illusory coverage. The Policy describes five different insured buildings [D.E. 42-19 at 2], any one of which could be vacant or occupied given WINDWARD's intended sale of units. Just because one building is not vacant and therefore excluded from coverage, that does not mean that the other buildings are not vacant and insured. WINDWARD instead takes an unwarranted all-or-nothing approach, arguing that if there is no coverage for an occupied building then there must be no coverage at all. Additionally, as units are sold, WINDWARD could and should have requested that the Policy be updated to reflect the same. Notwithstanding any request that WINDWARD may have given to its own agents, those agents never communicated any such request to UNITED NATIONAL prior to the subject loss.

## II. **F.S. 718.103 and/or F.S. 718.111 do Not Create Coverage.**

WINDWARD next asks this Court to create coverage and/or additional policy language where there is none in order to allegedly comply with F.S. 718.103 and F.S. 718.111(11). This argument is defective in multiple respects. First, it is an argument for coverage via estoppel, which WINDWARD did not plead or argue prior to its Response. Although not directly framed as such, WINDWARD's argument is functionally an argument of estoppel; WINDWARD argues that UNITED NATIONAL should be estopped from applying the vacancy exclusion which is a part of the prima facie Policy. WINDWARD's Complaint [D.E. 2], however, does not reference or

3

otherwise allege any form of estoppel. Allegations not raised in Plaintiff's operative Complaint but in response to a summary judgment motion are not properly before the Court. *See, e.g.,* Gilmour v. Gates, McDonald & Co., 382 F.3d 1312 (11th Cir. 2004); Chavis v. Clayton County Sch. Dist., 300 F.3d 1288 (11th Cir. 2002); Sands v. Key W. Hous. Auth., 06-10067-CIV, 2007 WL 1412943 (S.D. Fla. 2007).[1] Moreover, estoppel generally may not be used to create or extend coverage under a policy of insurance. Crown Life Ins. Co. v. McBride, 517 So.2d 660, 661 (Fla. 1987); AIU Ins. Co. v. Block Marina Inv., Inc., 544 So.2d 998, 1000 (Fla. 1989). *See also* Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program, 93-1570-CIV, 1996 WL 819721 (S.D.Fla. 1996) aff'd, 129 F.3d 581 (11th Cir. 1997) ("[C]ourts have no power to create insurance coverage where none exists on the face of the insurance contract.").

WINDWARD purportedly relies upon F.S. 718.103 and F.S. 718.111(11) to create coverage, but these statutes are irrelevant to the issues before the Court. These statutes are part of the Condominium Act, with F.S. 718.103 simply setting forth definitions under the same. WINDWARD's argument that F.S. 718.111(11) somehow creates mandatory insurance coverage superseding the terms of the Policy was expressly rejected in Citizens Prop. Ins. Corp. v. River Manor Condo. Ass'n, Inc., 125 So. 3d 846, 851 (Fla. 4th DCA 2013). River Manor argued that Citizens was estopped from relying upon certain coverage exclusions due to an alleged conflict with the insurance requirements set forth in the Condominium Act, F.S.718.111(11), Florida Statutes (2005).[2] The Fourth District rejected this argument, finding in relevant part as follows:

> "Mindful of these principles we now turn to an examination of section 718.111(11)(b), Florida Statutes (2005), in order to ascertain whether, as River Manor contends, it creates mandatory insurance coverage which conflicts with

---

[1] UNITED NATIONAL would further refer the Court to the exhaustive list of 11th Circuit cases cited by the Court in Sands v. Key W. Hous. Auth., 2007 WL 1412943 at p. 3.

[2] For the purposes of this Court's instant analysis, note that the insurance requirements described in 718.111(11)(b), Florida Statutes (2005) and analyzed by the *River Manor* court were subsequently revised and moved by the Legislature to subsection (11)(f) of the instant operative version of F.S. 718.111.

4

Citizens' exclusions. Before reviewing the precise language of the particular subsection at issue, we first observe that section 718.111 is contained within Chapter 718, aptly titled the "Condominium Act," the purpose of which is to give statutory recognition to the condominium form of ownership of real property and establish procedures for the creation, sale and operation of condominiums. *See* § 718.102, Fla. Stat. (2005). **As its title suggests, the "Condominium Act" regulates condominiums—not insurance companies.**

Furthermore, section 718.111 is titled "The association," and each of its subsections regulate the activities of that "Corporate entity." *See* § 718.111(1), Fla. Stat. (2005). The statute, for example, establishes how the association shall be constituted, *see* § 718.111(1)(a)-(c); the powers and duties of the association, *see* § 718.111(2)-(14), including the association's rights to own and convey property, *see* § 718.111(7)(a); and the association's right to purchase land, leases, and condominium units. *See* § 718.111(8)-(9). **The subject matter of this statute is clearly the regulation of condominium associations, as its title suggests.**

**The fact that section 718.111 is contained within the "Condominium Act"— which regulates only condominiums—and that section 718.111 is aimed squarely at condominium "associations," suggests that the objective of subsection 11 is not to further regulate the business of insurance—an industry extensively regulated elsewhere—but rather to impose certain insurance-related obligations on the association and its board.[2] The statute, read as a "cohesive whole," reflects a purpose of governing condominium associations, not insurers.** *See Harris,* 772 So.2d at 1287."

Citizens Prop. Ins. Corp. v. River Manor Condo. Ass'n, Inc., 125 So. 3d 846, 850-53 (Fla. 4th DCA 2013) (bold emphasis added).[3]

"We therefore hold that when considered as a cohesive whole, section 718.111(11), Florida Statutes (2005), is intended to regulate the insurance obligation of condominium associations by: (a) specifying the items that the association is responsible for covering versus the items that the unit owners are responsible for covering; and (b) requiring associations to use their "best efforts" to obtain the coverage it is responsible for securing. **The statute was not intended to impose a mandatory insurance obligation upon carriers**. We therefore reverse the judgment below to the extent it awards damages for items excluded under Citizens' policies."

Id. at 853 (bold emphasis added).

---

[3] Though not quoted at length herein for the purposes of readability, the entirety of the court's analysis under the subheading "**Citizens' Policy Exclusions Do Not Conflict With Section 718.111(11)(b), Florida Statutes (2005)**" is directly applicable to this action and should be instructive to this Court's analysis. Citizens Prop. Ins. Corp. v. River Manor Condo. Ass'n, Inc., 125 So. 3d 846, 849-853 (Fla. 4th DCA 2013).

5

Accordingly, F.S. 718.111(11) does not change or add any term to the Policy, nor does it estop UNITED NATIONAL from applying the vacancy exclusion. The authorities cited by WINDWARD [D.E. 46 at 5-6] are readily distinguishable and do not merit individual treatment at length herein. They solely involve Florida Insurance Code statutes specifically enacted to regulate the business of insurance in the area of uninsured motorist policies (F.S. 627.727),[4] personal injury protection policies (F.S. 627.736),[5] and homeowners' policies (F.S. 627.7011).[6] The statute relied upon by WINDWARD is part of the Condominium Act, not the Insurance Code, and does not purport to regulate insurance companies or the terms of their policies.

### III. The Application Does Not Create Coverage.

WINDWARD next argues that the Policy application somehow creates coverage and/or negates the vacancy exclusion because it "conflicts" with the Policy. WINDWARD points to only three vague aspects: (1) the box next to "VACANT BUILDING SUPPLEMENT" was not checked; (2) the "DESCRIPTION OF PRIMARY OPERATIONS" stated "residential"; and (3) a description of the property as "very well maintained" with units "being sold by developer".

With respect to the first aspect, the first page of the application includes small checkboxes for 17 different categories of attachments to the application. [D.E. 42-15 at 1]. The boxes simply indicate the presence or absence of attachments, rather than any "conflict" with the terms of the Policy. With respect to the second aspect, the second page of the application notes that the buildings are residential. [Id. at 2]. This is not a conflict with the Policy, as it does not reference occupancy or vacancy whatsoever. With respect to the third aspect, the fifth page of the application

---

[4] U. S. Fire Ins. Co. v. Van Iderstyne, 347 So. 2d 672 (Fla. 4th DCA 1977); Auto-Owners Ins. Co. v. DeJohn, 640 So. 2d 158 (Fla. 5th DCA 1994)
[5] MRI Associates of St. Pete, Inc. v. State Farm Mut. Auto. Ins. Co., 755 F. Supp. 2d 1205 (M.D. Fla. 2010); Allstate Ins. Co. v. Kaklamanos, 843 So. 2d 885 (Fla. 2003).
[6] Trinidad v. Florida Peninsula Ins. Co., 121 So. 3d 433 (Fla. 2013).

6

includes a remark stating "very well maintained site, units being sold by developer." [Id. at 5]. This is not a conflict with the Policy, as it does not reference occupancy or vacancy whatsoever. As referenced earlier, the sale of a unit in any one of five buildings would not necessarily preclude the other buildings from being vacant. Most tellingly, the subject Policy application is virtually identical to the application for the previous policy period [D.E. 42-7]. The previous application included all three aspects cited by WINDWARD [Id. at 1, 2, 5], and was sent to UNITED NATIONAL along with an email **specifically requesting "a vacant policy for now(no units sold or occupied)"**. [D.E. 42-6]. The notion that these aspects of the application directly conflict with the Policy requires multiple logical leaps, and is simply not merited under the circumstances.

Rather than UNITED NATIONAL, it is WINDWARD that adopts an aggressively narrow focus on the three application aspects above at the expense of the larger context of the Policy as a whole. The Policy as a whole includes a "Schedule of Forms and Endorsements" listing at least four forms directly referring to "vacancy" or "vacant building", Declarations identifying the "Business Description" as "Vacant Building", a Schedule of Covered Premises identifying the property as vacant, and endorsements titled "Vacancy Permit", "Vacant Building Special Additional Coverages and Increased Limits of Insurance Endorsement", "Vacant Building Amendatory Endorsement", "Secured Vacant Building Requirement", and "Vacancy Requirement". [D.E. 43 at 18-19]. The Policy as a whole was preceded by a 2011-2012 which was substantially identical. [D.E. 42-11].

Even if there was a conflict, the terms of the Policy would control. WINDWARD's citations to purported authorities are readily distinguished in that they directly rest upon another inapplicable statute. WINDWARD accurately cites the general rule that "[w]hen there are conflicts between the application and the policy, the terms of the policy control . . ." [D.E. 46 at 9].

7

WINDWARD then cites a purported exception to that general rule, arguing that the terms of the policy do not control where the provisions of the application would result in a greater degree of indemnity. All of the authorities cited by WINDWARD in support of this exception are expressly based upon F.S. 627.419,[7] which does not apply to surplus lines carriers or policies. F.S. 626.913(4). There is no dispute that the subject Policy is a surplus lines policy, therefore F.S. 627.419 and the cases interpreting the same should have no bearing upon this Court's analysis. Subtracting those cases, the Court is left with only two things: (1) the general rule that the terms of the Policy should control over the application; and (2) an acknowledgement signed by WINDWARD's retail insurance agent stating that the terms of coverage may be more restrictive than those requested in the application [D.E. 42-19 at 6].

Lastly, and similar to UNITED NATIONAL's response to WINDWARD's allegations of illusory coverage, the enforcement of the vacancy exclusion does not result in "a forfeiture of the entire policy" [D.E. 46 at 10]. It also does not result in a forfeiture "after an event has given rise to an insurer's liability", as the vacancy exclusion was part of the Policy from its inception (and incidentally was part of the immediately preceding policy as well). From its inception, the Policy provided coverage for vacant buildings. The authority cited by WINDWARD, LeMaster v. USAA Life Ins. Co., 922 F. Supp. 581 (M.D. Fla. 1996), concerns express forfeiture of a policy for application misrepresentation pursuant to F.S. 627.409, which is yet another inapplicable statute.

## IV.     The Vacancy Exclusion is Unambiguous and Does Not Lead to an Absurd Result

WINDWARD's allegations of illusory coverage and/or an "absurd result" are without merit as previously addressed. WINDWARD's allegation that UNITED NATIONAL "is

---

[7] *See* Gen. Star Indem. Co. v. W. Florida Vill. Inn, Inc., 874 So. 2d 26 (Fla. 2d DCA 2004); Mathews v. Ranger Ins. Co., 281 So. 2d 345 (Fla. 1973); State Farm Mut. Auto. Ins. Co. v. Mallard, 548 So. 2d 733 (Fla. 3d DCA 1989); Quick v. Nat'l Indem. Co., 231 So. 2d 22 (Fla. 4th DCA 1970) (predecessor statute to 627.419); Zenith Ins. Co. v. Commercial Forming Corp., 850 So. 2d 568 (Fla. 2d DCA 2003).

examining the vacancy endorsement in isolation and out of context" is itself absurd, given the Policy as a whole. Again, this is not a case where the policy language is reasonably susceptible to two interpretations, one providing coverage and one excluding coverage. UNITED NATIONAL's "interpretation" is to apply the vacancy exclusion as written. WINDWARD's "interpretation" is not a reasonable interpretation of the vacancy endorsement as written, but is instead an attempt to deny the existence of the exclusion's text in favor of irrelevant parol evidence. That is not ambiguity. WINDWARD improperly conflates ambiguity with estoppel. Ambiguity was the only one pled, though neither exists here.

V.     **WINDWARD is not Entitled to Reformation**

WINDWARD has not shown any evidence of a relevant mistake or inequitable conduct on the part of UNITED NATIONAL that would justify the extreme remedy of reformation, let alone by clear and convincing evidence overcome the presumption that the Policy as written is a true expression of the contract between the parties. The "general issues of material fact" [D.E. 46 at 14] alleged by WINDWARD do not remedy this, as each "general issue of material fact" is one or more of the following: (1) not indicative of mistake or inequitable conduct by UNITED NATIONAL; (2) irrelevant to the procurement/underwriting/issuance of the Policy; (3) out of context and misleading; and/or (4) an uninformed and improper legal conclusion. These allegations are amply addressed, rebutted, and/or placed into context in UNITED NATIONAL's subject Motion (particularly in the Statement of Facts therein [D.E. 43 at 3-9]).

The retail insurance agent ("Underwood") and the broker ("Appalachian") are presumed under the law to be, and were in fact, WINDWARD's agents in the procurement of the Policy, and any failure(s) on their part are therefore imputed to WINDWARD. *See, e.g.,* Landmark Am. Ins. Co. v. Moulton Properties, Inc., 440 Fed. Appx. 788, 793 (11th Cir. 2011) (quoting Essex Ins. Co.

v. Zota, 985 So.2d 1036, 1046 (Fla.2008)); Almerico v. RLI Ins. Co., 716 So.2d 774, 776–77 (Fla.1998); D.E. 42-23. Correspondingly, the knowledge, acts, and/or receipt of documents by Underwood and/or Appalachian are not imputed to UNITED NATIONAL, as it has no relationship with Underwood and its relationship with Appalachian is specifically defined and limited by their agreement. Id. See also D.E. 7-2. . To the extent that the evidence shows any mistake or inequitable conduct, it was on the part of WINDWARD and/or its agents.

Although this Court's reformation analysis should begin and end at the initial formation of the contract, the evidence also does not support WINDWARD's version of events subsequent to the issuance of the Policy. There is no question that WINDWARD's agent Appalachian did not request removal of the vacancy exclusion endorsement until well after the subject loss, so any suggestion that the exclusion should have been removed before that time is without merit.

**VI.** <u>**Rescission**</u>

WINDWARD's alleged grounds for rescission are substantially identical to its alleged grounds for reformation, and UNITED NATIONAL replies in kind. As with reformation, this Court can and should resolve this claim as a matter of law based upon UNITED NATIONAL's Motion and record evidence. With respect to WINDWARD's claim for attorneys' fees, the authority that it cites is expressly based upon a statute inapplicable here.

Respectfully Submitted: March 30, 2015

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 30, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that the foregoing document is being served this day to all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Christopher W. Hollman*
Bruce A. Aebel
Florida Bar No: 0066435
Email:  baebel@bankerlopez.com
Christopher W. Hollman
Florida Bar No: 0037074
Email:  chollman@bankerlopez.com
BANKER LOPEZ GASSLER P.A.
501 E. Kennedy Blvd., Suite 1500
Tampa, FL  33602
(813) 221-1500
Fax No: (813) 222-3066
Attorneys for Defendant United National